**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**
**CHARLESTON DIVISION**

| | | |
|---|---|---|
| VIKING ENERGY CORPORATION, a West Virginia Corporation, and VIKING TRANSPORTATION & DISPOSAL COMPANY, LLC, a West Virginia Limited Liability Company, | : : : : : : | CIVIL ACTION NO.:  2:24-cv-00126 |
| Plaintiffs, | : : | |
| v. | : : : | |
| CERTAIN UNDERWRITERS AT LLOYD'S, LONDON, consisting of Lloyd's Syndicate Numbers 4020, 1458 and 1084, | : : | |
| Defendants. | | |

**JURY TRIAL DEMANDED**

---

**COMPLAINT**

---

**The Parties**

1.      Plaintiffs, Viking Energy Corporation ("Viking") and Viking Transportation & Disposal Company, LLC, ("T&D") are related West Virginia companies.  Viking is a corporation. T&D is a limited liability company.  Both companies are engaged in the oil and gas industry with principal offices located in Kanawha County, West Virginia.

2.      This action involves an insurance policy titled as a "Site Pollution Liability" insurance policy issued by the Defendant, Certain Underwriters at Lloyd's of London, consisting of Lloyd's Syndicate Numbers 4020, 1458 and 1084 ("Lloyd's").  Lloyd's is an "Insurer" within the meaning of West Virginia Code 33-1-2, in that Lloyd's is engaged in the business of making

contracts of insurance, and did make a contract of insurance with the Plaintiffs, as more fully set forth hereinbelow.

3.      Although not a defendant herein, Premier Claims Management, LLC, (hereinafter "Premier Claims") is a principal participant in the handling and mishandling of the claim that is the subject of this action, as set forth hereinbelow.  Premier Claims is a limited liability company organized under the laws of the State of California, with its principal office located at 2020 North Tustin Avenue, Santa Ana, California, 92705.  In the instant matter, Premier Claims acted as a designated, authorized agent of Lloyd's in the receipt, acknowledgment, investigation and handling of a claim under the above-referenced Site Pollution Liability policy, and, as such, both Premier Claims and Lloyd's are subject to applicable provisions of West Virginia law in connection with the handling of insurance claims, including but not limited to the provisions and prohibitions of the Unfair Claims Settlement Practices Act, West Virginia Code 33-11-4(9).

### Jurisdiction and Venue

4.      This Court has subject matter jurisdiction of this action based upon a diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2).

5.      Venue of this action is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events giving rise to the claim occurred in this judicial district, and the property that is the subject of the insurance claim here in issue is located in this judicial district.

### The Site Pollution Liability Policy

6.      Effective March 19, 2015, Lloyds issued a liability insurance policy to T&D as the named insured.  That Policy bears Policy No. PGIARK04788-00 (the "Policy").  A true and correct copy of the Policy is attached hereto as Exhibit 1.  The Policy covers a policy period from March

19, 2015 through November 1, 2015. The Policy provides a liability limit of $1,000,000.00, subject to a deductible of $10,000.00 per claim. The Policy specifies two covered sites, one at Derricks Creek, West Virginia, and the other at Tuppers Creek, West Virginia. The declarations of the Policy make clear that the coverage is written on a "claims made" form. The Policy identifies Premier Claims as the agent of Lloyd's to receive notice of any claim under the Policy.

7.      The basic coverage provisions of the Policy appear in a form entitled "Site Pollution Liability Policy" (Form PGI EL 026 0210). The provisions of the Policy make clear that it affords coverage for "POLLUTION CONDITIONS DISCOVERED, OR CLAIMS FIRST MADE AND REPORTED, DURING THE POLICY PERIOD…." The basic coverage provisions of the Policy are set forth in Section I entitled "Insuring Agreements". Under Coverage A ("Onsite Cleanup") the Policy provides that: "The Company will pay cleanup costs that result from pollution conditions at, on, or under the Insured's site(s) to which this insurance applies…." Under Coverage B ("Third Party Claims") the Policy provides in relevant part that: "The Company will pay on behalf of the Insured those sums that the Insured becomes legally obligated to pay as damages from claims for bodily injury or property damage that result from pollution conditions at, on, under or migrating from the Insured's site(s) to which this insurance applies." The Policy further contains a duty to defend, stated as follows: "The Company will have the right and duty to defend the Insured against any suit seeking those damages." In Section VII, the Policy contains "Definitions" of key terms that appear in the insuring agreements. Thereunder, Subsection E defines the term "Claim" in relevant part to mean: "… a written request or demand received by an Insured for money or services, including the institution of a suit… against an insured seeking damages." Subsection F defines the term "Cleanup" in relevant part to mean: "… the investigation, evaluation, monitoring, testing, removal, containment, treatment, disposal, remediation,

detoxification or neutralization of pollutants….." Subsection G defines "Cleanup costs" to include:

"… the expenses incurred to perform a cleanup." Subsection O defines "Pollutant(s)" to include:

"… any solid, liquid, gaseous or thermal irritant or contaminate…." Subsection P defines

"Pollution conditions" to mean: "the discharge, dispersal, seepage, migration, release or escape of

pollutants." Subsection Q defines "Property damage" to mean:

1) Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
2) Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the pollution condition that caused it; or
3) Cleanup costs; or
4) Diminished third party property value;
5) Physical injury to or destruction of, including the resulting loss of value of, land, fish, wildlife, biota, air, water, groundwater, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States, any state or local government, any foreign government, any Indian tribe, or, if such resources are subject to a trust restriction on alienation, any member of an Indian tribe.

8.    The Policy was designed to provide liability coverage and "Cleanup costs" coverage at the two (2) designated sites identified in the Policy, to-wit, the Derricks Creek and Tuppers Creek sites.

9.    The Policy was intended to afford benefits and protections to T&D and Viking for property damage to property consisting of the Derricks Creek and Tuppers Creek sites, and any surrounding or adjoining real property.

**The Davis/Shaffer Action**

10.    On or about June 16, 2015, a civil action for damages was filed by and on behalf of two (2) property owners, Denver Davis ("Davis") and Gary Shaffer ("Shaffer") against Viking and a related company M&S Properties, LLC (hereinafter referred to as the "Davis/Shaffer Action").

A true and correct copy of the Complaint filed in the Davis/Shaffer Action is attached hereto as Exhibit 2.

11.     The plaintiffs in the Davis/Shaffer Action alleged they were owners of real property located in Kanawha County, West Virginia.  They alleged that their property had suffered harm, damage and injury by virtue of "a drilling waste disposal well operation" which, according to Davis and Shaffer "is unlawfully pumping large volumes of waste over, onto and within Plaintiffs' surface and subsurface property…."  Exhibit 2 ¶ 1.  They further alleged that the drilling waste disposal well, which was actually operated by T&D, had "destroyed property, left debris, is pumping industrial waste onto Plaintiffs' property…."  Id.  In the Complaint Davis and Shaffer sought an injunction prohibiting the placing of waste material into, onto or within their real property, and they sought compensatory damages for the damage to their property.  Id.  The drilling waste disposal well operation described in the Complaint in the Davis/Shaffer Action included the Derricks Creek Site operated by T&D, which was one of the designated covered sites identified in the Policy.

12.     The damage to real property clearly alleged in the Complaint in the Davis/Shaffer Action constitutes physical injury to tangible property, as well as "Cleanup costs", diminished property value, as well as "Physical injury to or destruction of… land", all of which constitute "Property damage" under the Policy.  As such, the allegations in the Davis/Shaffer Action describe a claim that is squarely within the coverage of the Policy, specifically the "Third Party Claims" coverage set forth in Paragraph 7 above.  Further, the conditions described in the allegations of the Davis/Shaffer Action also constitute an incident that would call for the expenditure of "Cleanup costs" that result from "Pollution conditions" within the scope of the "Onsite Cleanup" coverage under Coverage A of the Insuring Agreements of the Policy.

13. Immediate notice of the Davis/Shaffer Action was communicated to Premier Claims on July 14, 2015, in full compliance with the notice requirements of the Policy. Accordingly, Viking became entitled to all of the benefits and protections of the Policy, including the benefits of the "Cleanup costs" coverage under Coverage A, and the benefits and protections of the "Third Party Claims" coverage under Coverage B, including but not limited to a defense to the claims alleged in the Davis/Shaffer Action.

14. By email dated July 17, 2015 (MG 15-16), an individual named Michelle C. L. Edborg, who identified herself as "General Counsel" at Premier Claims communicated with Viking and T&D regarding the Davis/Shaffer claim. In her email Ms. Edborg identified both Viking and T&D as "Insured" under the Policy. Ms. Edborg provided a claim number (04-005540) that had been assigned to the Davis/Shaffer claim. Ms. Edborg stated that Premier Claims "is the third party administrator for [Lloyd's]… with respect to the above captioned claim." Ms. Edborg acknowledged that the Davis/Shaffer claim "was recently referred to [Premier Claims] for handling." Ms. Edborg advised that Premier Claims was "in the process of investigating this claim", and that an individual named Matthew Arigo had been assigned to the claim for handling. A true copy of the July 17, 2015 email is attached hereto as Exhibit 3.

15. By an electronic mail message dated August 3, 2015 to Eric Pinkerton, an officer of Viking, Premier Claims advised that an "investigation is underway". Premier Claims further admonished Viking "to take whatever action is necessary to protected [sic] the best interests of your company in this litigation." A true copy of Premier Claims' August 3, 2015 email is attached hereto as Exhibit 4.

16. By August 2015, Viking had engaged Ken Webb, Esquire, a partner in the Charleston, West Virginia law firm of Bowles Rice to protect the best interests of Viking, exactly

as directed by Premier Claims.  Mr. Webb, on behalf of Viking, was in communication with Premier Claims on or before August 17, 2015 and advised that a mediation was going to be held in the Davis/Shaffer Action and that the date of the mediation might be September 2 or September 10, 2015.  A true copy of a document from the files of Premier Claims memorializing that communication is attached hereto as Exhibit 5.  By email dated September 3, 2015 Mr. Webb notified Mr. Arrigo that the mediation had been set for September 10, 2015 in Charleston, West Virginia.  A true and correct copy of the September 3, 2015 email is attached hereto as Exhibit 6.

17.    At no time did Mr. Arrigo advise either Viking or T&D, or their counsel Ken Webb, that Premier Claims or Lloyd's had any objection whatsoever to the insureds proceeding to mediate the Davis/Shaffer Action on September 10, 2015.  To the contrary, Premier Claims on behalf of Lloyd's fully acquiesced in the matter proceeding to mediation.

18.    Notwithstanding that Mr. Arrigo was notified by Mr. Webb by August 17, 2015 of the impending mediation of the Davis/Shaffer Action, Premier Claims and Lloyds did nothing in advance of the mediation.  They did not participate in the evaluation of the claims against their insureds.  They did nothing to facilitate a negotiation of settlement.  They did not engage counsel to provide a defense.  They offered nothing; they did nothing to advance settlement; nor did they take any other action to afford their insureds the benefits and protections of the Policy.

19.    Instead of acting to protect or advance the interest of their insureds, at some point between August 17, 2015 but prior to the September 10, 2015 mediation, Premier Claims and/or Lloyd's retained the Arizona law firm of Meagher & Geer to represent the interests of Lloyd's in relation to the Davis/Shaffer Action.  At the same time, however, Premier Claims and/or Lloyd's deliberately took no action to provide a defense, or assist their insureds in the effort to resolve the claims against them.

20.    By letter dated September 8, 2015 a lawyer named Kurt M. Zitzer, Esquire of Meagher & Geer communicated with Mr. Webb.  A true and correct copy of Mr. Zitzer's September 8, 2015 letter is attached hereto as Exhibit 7.

21.    Mr. Zitzer confirmed that Viking had "tendered the [Davis/Shaffer Action] matter to Underwriters for defense and indemnity."  Mr. Zitzer stated that: "Underwriters have been conducting an investigation into the claim, both on the merits of the allegations against the Insured and the defenses thereto, and as to any potential coverage Underwriters may owe pursuant to the policy of insurance."  In fact, however, no investigation had occurred, beyond a request to Viking to provide some basic information.

22.    In his letter Mr. Zitzer took no position in the letter either as to coverage, nor the merits of the claim.  Mr. Zitzer stated in the letter that "We have recently found out that the insured scheduled mediation in the above referenced matter for September 10, 2015", even though Premier Claims had been aware of the mediation as early as August 17, 2015, more than three (3) weeks earlier.  Mr. Zitzer stated in the letter that: "The mediation date was selected without consultation with Underwriters", even though Mr. Arrigo at Premier Claims was in communication with Ken Webb during the process of the scheduling of the mediation, and never sought an opportunity to participate in such scheduling.  Mr. Zitzer stated in the letter that: "Underwriters are unable, given the short notice, to arrange for someone to attend the mediation on behalf of the insured", even though Lloyd's and/or Premier Claims plainly had had more than sufficient notice to have someone attend the mediation, if, in fact, there had been a desire to do so.  Finally, Mr. Zitzer stated in the letter that "Underwriters will not object to the mediation going forward"; but followed that statement with the false assertion that: "Based upon their communication with your office, it does

not appear that the Insured is requesting that Underwriters offer any indemnity on behalf of the Insured at this mediation."

23. Mr. Zitzer's September 8, 2015 letter was emailed to Ken Webb on that date by an individual named Vanessa Henderson at Meagher & Geer.

24. Contrary to the false statement of Mr. Zitzer, as above quoted, Mr. Webb never intimated to anyone in any manner that Viking and/or T&D were declining indemnity from Lloyd's, nor did Mr. Webb ever suggest that they were declining any other benefits or protections of the Policy. To the contrary, the fact is that Lloyd's never proffered any benefits. The false statement contained in Mr. Zitzer's September 8, 2015 letter was designed as an artifice to enable Lloyds to strategically avoid affording its insureds any benefits of the Policy.

25. A mediation of the Davis/Shaffer Action was conducted on September 10, 2015. The mediation was conducted by Charleston, West Virginia attorney, Robert B. Allen, Esquire, a well-known and qualified mediator. The mediation resulted in a negotiated settlement. By email dated September 10, 2015, Ken Webb notified Vanessa Henderson with the law firm of Meagher & Geer that the Davis/Shaffer Action had been settled at mediation. Mr. Webb specifically asked Ms. Henderson "If you need anything further". A true and correct copy of Mr. Webb's email of September 10, 2015 is attached hereto as Exhibit 8.

26. Mr. Webb also notified Premier Claims that the Davis/Shaffer Action had been settled at mediation. A true and correct copy of Mr. Webb's email is attached hereto as Exhibit 9. Mr. Webb clearly did not waive any T&D's to any of the benefits of the Lloyd's Policy. Nor did he release or exonerate Lloyd's from its obligations under the Policy relative to the settlement. However, neither Ms. Henderson, nor anyone else at Meagher & Geer, nor anyone from Premier Claims, nor Lloyd's ever requested any further information about the settlement. To the contrary,

Lloyds and its contractors, agents, servants, employees, and whomever else may have acted on its behalf ignored the Davis/Shaffer Action and the settlement as though those events had never occurred.

27.     Under the terms of the settlement, Viking/T&D were called upon to pay the sum of Fifty Thousand Dollars ($50,000.00) in cash, and T&D was required to plug an active well located on the site.  In addition, Viking/T&D were obligated to pay one-half (1/2) of the fee of the mediator.  A true and correct copy of a document entitled "Settlement Agreement" reflecting the terms of the settlement is appended hereto as Exhibit 10.

**Lloyds' Blatant Disregard of its Obligations Under the Policy**

28.     The Fifty Thousand Dollar ($50,000.00) cash payment, subject in part to the Ten Thousand Dollar ($10,000.00) deductible, should have been paid or reimbursed by Lloyds under the terms of the "Third Party Claims" coverage set forth under Coverage B of the Insuring Agreement.

29.     The costs and expenses incurred by Viking in plugging the active well were "Cleanup costs" within the meaning of the Policy, and, therefore, should have been paid or reimbursed by Lloyds under the provision of the "Cleanup costs" coverage under Coverage A of the Policy.

30.     The amount paid to the mediator was a defense expense that should have been paid or reimbursed by Lloyds as part of its duty to defend as set forth in the "Third Party Claims" coverage under Coverage B of the Policy.

31.     Notwithstanding the foregoing, Lloyds did not pay or reimburse all or any part of the $50,000.00 cash payment; did not pay or reimburse all or any part of the cost of plugging the

active well; and neither paid nor reimbursed any part of the amount paid to the mediator as part of the terms of the settlement.

32.     Subsequent to September 10, 2015, despite the agreements that were made at mediation, disputes arose over the terms of the aforesaid settlement.  Ultimately the parties agreed to conduct arbitration to resolve those disputes.  The parties engaged Robert Allen, Esquire as arbitrator and proceeded to arbitrate the matter.  Ultimately, Mr. Allen rendered an award dated September 23, 2016 adjudicating the disputes that had arisen over the settlement.  A true and correct copy of the September 23, 2016 Arbitration Award is attached hereto as Exhibit 11.

33.     Mr. Webb and Bowles Rice continued to represent the interests of Viking in connection with the disputes that arose over the settlement of the Davis/Shaffer Action and the arbitration thereof.  Lloyds never did engage counsel to represent Viking, nor otherwise afford any benefits or protections under the "Third Party Claims" coverage contained in Coverage B under the Insuring Agreements of the Policy, nor did Lloyds offer to pay or pay or reimburse all or any part of the legal fees and associated litigation expenses incurred by Viking in connection with the matter.

34.     Despite never having provided nor even offered its insureds any of the benefits of the Policy, at any time from and after initial notice of the Davis/Shaffer Action in July 2015, Lloyds never declined coverage, nor provided its insureds with any statement of position or explanation of any kind about its failure to do so.

35.     By letters dated July 15, 2022 and August 16, 2022, Steven L. Thompson, Esquire, who had been engaged by Viking to pursue coverage issues relating to the Policy wrote to Mr. Zitzer inquiring as to why Lloyds had never afforded its insureds any of the benefits of the Policy. Mr. Zitzer responded by letter dated October 4, 2022, a true copy of which is attached as Exhibit

12. Mr. Zitzer's letter falsely states that Ken Webb informed Mr. Arrigo of Premier Claims about "a mediation [which] was scheduled in the next several days", when, in fact, Mr. Arrigo was advised of the mediation more than six weeks in advance. Mr. Zitzer further falsely stated that Mr. Webb informed Mr. Arrigo "that Viking was not asking Underwriters to participate in the mediation, contribute towards (sic) any settlement, and/or to defend the matter on a going forward basis." In fact, Mr. Webb never informed Mr. Arrigo of such, either directly or by implication. Mr. Zitzer further falsely stated: "In short, Viking's counsel withdrew any tender by informed Underwriters it was not being asked to participate in any settlement or defense at that time." In fact, Mr. Webb definitively *did not* withdraw any tender, either expressly or by implication. Mr. Zitzer's statements are categorically false, and were designed by him to conceal a tactical effort on his part to avoid having Lloyds provide any benefits of the Policy.

36. To the extent that Mr. Zitzer's October 4, 2022 letter communicated "Underwriters' position that Viking's original tender was withdrawn by the statements of Viking's counsel", that false assertion in the October 4, 2022 letter constitutes a clear and flagrant breach of the insurance contract.

37. Further, in his letter of October 4, 2022, Mr. Zitzer stated that "If Viking does not accept" Lloyds' asserted position that Mr. Webb acted to withdraw the "original tender", then: "Viking has clearly breached the terms and conditions of the policy", citing Section V.B. entitled "Insured's Duties". That provision of the Policy contains what is euphemistically referred to as the "cooperation clause", under which an insured "must cooperate with the [insurer] and offer all reasonable assistance in the investigation and defense of any claim…." On the basis of his baseless assertion that Viking had deviated from the cooperation requirements, Mr. Zitzer stated: "I must

regrettably inform Viking that Underwriters declines to reopen this claim for the purpose of further adjustment."

38.    Mr. Zitzer's baseless incantation of the cooperation provision, and his meritless accusation of a breach of the cooperation requirements of the Policy, were entirely pretextual, and were deceptively employed by Mr. Zitzer as a strategic method of evading the fact that Lloyds failed to proffer or provide any of the benefits of the Policy.  In that additional regard, Mr. Zitzer's October 4, 2022 letter constitutes a clear and flagrant breach of the provisions of the Policy.

39.    In addition to the foregoing, in his letter of October 4, 2022, Mr. Zitzer falsely asserted that: "Viking made a voluntary payment by incurring defense and indemnity charges without the Company's knowledge, much less the Company's written consent."  On that false basis, Mr. Zitzer stated that: "Such costs are incurred at Viking's own expense, and not covered under the policy."  Those assertions are flatly false and deceptive, and constitute an additional clear, obvious and flagrant breach of the Policy.

40.    Finally, in substance and effect, Mr. Zitzer's tenacious refusal "to reopen this claim for the purpose of further adjustment" constitutes a repudiation and blatant disregard of Lloyds' obligations under the Policy, and, consequently, a breach of the insurance contract.

### Plaintiffs' Harm and Injury

41.    By virtue of the breach of the insurance contract effectuated by Mr. Zitzer's October 4, 2022 letter, Viking and T&D have sustained injuries and damages, including but not limited to the following:

a.    They expended the sum of Fifty Thousand Dollars ($50,000.00) in the settlement of the Davis/Shaffer Action, which sum should have been paid or reimbursed in whole or in part by Lloyds under the Policy;

b.      They incurred costs and expenses to plug an active well as part of the settlement of the Davis/Shaffer Action, which costs and expenses should have been paid or reimbursed by Lloyds under the Policy;

c.      They incurred substantial legal fees and expenses, because Lloyds failed to provide a defense, and because, by his letter of October 4, 2022, Mr. Zitzer, acting for and on behalf of Lloyds, stubbornly refused to "reopen this claim for the purpose of further adjustment".

42.      By virtue of Mr. Zitzer's October 4, 2022 letter declining to "reopen this claim for the purpose of further adjustment", the Plaintiffs have sustained consequential damages of the type recognized by the doctrine of Hayseeds, Inc. v. State Farm Fire & Cas., 352 S.E.2d 73 (W.Va. 1986), including but not limited to: (1) they have incurred attorneys' fees and costs of litigation to remedy Lloyds' refusal to provide the benefits and protections of the Policy; (2) they have sustained net economic loss by virtue of the breach of the insurance contract; (3) they have suffered aggravation and inconvenience; (4) they have endured other resulting consequential harm and injury to their business reputations, and additional incidental and consequential harm and injury.

**COUNT I**
**BREACH OF THE INSURANCE CONTRACT**

43.      Plaintiffs incorporate Paragraphs 1 through 42 as though set forth at length herein.

44.      The conduct of the Defendant, Lloyds, specifically by virtue of the above-described letter from Mr. Zitzer dated October 4, 2022, constitutes a breach of the insurance contract, in that by virtue of that letter, Mr. Zitzer, purporting to act on behalf of Lloyds, flatly refused to provide the insureds with any of the benefits and/or protections of the Policy.

45.      By virtue of the breach of contract, the Plaintiffs have sustained the damages and injuries described in Paragraphs 41 and 42.

WHEREFORE, Plaintiffs demand judgment for compensatory damages, including but not limited to compensatory damages under the Hayseeds rubric described in Paragraph 42. In addition, if and to the extent that the evidence demonstrates that the conduct of Lloyds and its agents, servants, and contractors reaches a high threshold of actual malice, the Plaintiffs demand an award of punitive damages.

## COUNT II
## VIOLATION OF THE WEST VIRGINIA UNFAIR CLAIM SETTLEMENT PRACTICES ACT, WEST VIRGINIA CODE 33-11-4(9)

46.    Plaintiffs incorporate Paragraphs 1 through 45 as though set forth at length herein.

47.    The conduct of the Defendant, specifically by virtue of the October 4, 2022 letter issued by Mr. Zitzer for and on behalf of Lloyds, represents the culmination of a series of acts and courses of conduct performed with sufficient frequency as to indicate a general business practice that violates the provisions of the West Virginia Unfair Claim Settlement Practices Act, West Virginia Code 33-11-4(9).

48.    The acts and courses of conduct committed by the Defendant, by and through its agents, including Premier Claims and its lawyers Meagher & Geer, include all of the following:

A.    Misrepresenting and misstating pertinent facts in violation of West Virginia Code 33-11-4(9)(a);

B.    Misrepresenting by concealment insurance policy provisions relating to coverages at issue, specifically provisions that entitled the insureds to benefits or protections of the Policy in violation of West Virginia Code 33-11-4(9)(a);

C.    Failing to act reasonably promptly upon communications with respect to a claim arising under the Policy, including but not limited to failing to proffer to the insureds benefits and protections that the Defendant knew were due and owing under the Policy,

when the Defendant knew that the insureds were about to engage in mediation to settle the claim;

D.     Failing to act reasonably promptly with respect to a claim within the coverage of the Policy, by *inter alia* neglecting to appoint a representative to appear and participate in mediation, despite more than adequate advance notice, in violation of West Virginia Code 33-11-4(9)(b);

E.     Failing to adopt and implement reasonable standards for the prompt investigation of a claim within the coverage of the insurance Policy, by, *inter alia*, failing to follow up with the insureds or their counsel to obtain information presumably required by the insurer to determine coverage in violation of West Virginia Code 33-11-4(9)(c);

F.     Perpetrating pretextual and artificial positions, including unnecessary requests for information, in an effort to avoid taking a coverage position under the terms of the Policy;

G.     Refusing to make any payment, or otherwise pay or offer to pay reimbursement to the insureds without basis, and without actively pursuing a reasonable investigation based upon all available information in violation of West Virginia Code 33-11-4(9)(d);

H.     Failing to affirm or deny coverage of a claim under the Policy in violation of West Virginia Code 33-11-4(9)(e);

I.     Compelling the Plaintiffs, both of whom are insureds under the Policy, to institute litigation to recover amounts due under the Policy by offering nothing, in violation of West Virginia Code 33-11-4(9)(g);

J.      Failing to provide, promptly or otherwise, a reasonable explanation of the basis in the provisions of the insurance Policy, or any other reasonable basis, for the denial of the Plaintiffs' claim; instead providing vacuous, nonsensical, pretextual, and deceptive grounds for non-payment, such as the preposterous assertion that Lloyds declines to "reopen the file" or provide any further adjustment of the claim, in violation of West Virginia Code 33-11-4(9)(n); and

K.      Otherwise acting in a stubborn, recalcitrant, deceptive, blatantly self-interested and obstreperous manner relative to a claim against its insured that is within the scope of coverage of an insurance policy.

49.     By virtue of the Defendant's violation of the Unfair Claims Settlement Practices Act, the Plaintiffs have endured the harm, injury and damages stated in Paragraphs 41 and 42 above.

WHEREFORE, the Plaintiffs demand judgment for compensatory damages.  To the extent that the conduct of the Defendant exhibits a high threshold of actual malice, the Plaintiffs demand an award of punitive damages.


Date:  March 15, 2024                          By:    /s/ Avrum Levicoff
                                                     Avrum Levicoff, Esquire
                                                     Pa. I.D. #:  26044
                                                     The Levicoff Law Firm, P.C.
                                                     4 PPG Place, Suite 200
                                                     Pittsburgh, PA  15222-3911
                                                     (412) 434-5200

                                                     *Counsel for Plaintiff*